

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| FEDERAL CORPORATION, INC., | § | |
| Appellant, | § | |
| v. | § | No. 08-16-00095-CV |
| DESIREE TRUHLAR, CARLOS | § | Appeal from the |
| ALVAREZ, ROSENDO AGUILAR, | § | |
| JENNIFER BUTLER, MARIA T. RUIZ, | | County Court at Law #3 |
| AUDEN TERCERO, LUCIA | § | |
| CERECERES, ROBERTO RODRIGUEZ, | | of El Paso County, Texas |
| PRISCILLA RODRIGUEZ and LIBERTY | § | |
| MUTUAL FIRE INSURANCE | | (TC# 2014DRCV1401) |
| CORPORATION, | § | |
| Appellees. | § | |

**O P I N I O N**

Federal Corporation, Appellant, a Taiwanese manufacturer, sold tires to two wholesale distributors in the United States, one in California (Tire Dealer's Warehouse), the other in Mississippi (Dunlap & Kyle). Desiree Truhlar, Carlos Alvarez, Rosendo Aguilar, Jenifer Butler, Maria T. Ruiz, Auden Tercero, Lucia Cereceres, Roberto Rodriguez, Priscilla Rodriguez and Liberty Insurance, Appellees, claim a Federal tire failed and caused an accident in Texas in which three people were killed and two others injured, all Texas residents. The tire at issue was shipped from Taiwan to a Tire Dealer's Warehouse, in Phoenix, Arizona, but allegedly purchased in Texas.

After it was sued, Federal filed a special appearance. Appellant contends the subject tire

was sold in Taiwan. Appellant asserts it is a Taiwanese company with no contacts in Texas, and therefore, specific jurisdiction cannot stand because mere placement in the stream of commerce and foreseeability is not enough to uphold the trial court's finding of specific jurisdiction. Appellees refute Appellant's argument, claiming Appellant purposefully availed itself of Texas' jurisdiction by placing their tires in the stream of commerce in Texas. Appellees point to Appellant's purposeful activities in Texas: (1) shipping tires directly to Texas; (2) sending promotional materials to Texas distributors; (3) meeting with distributors in Texas once or twice a year; (4) assisting Texas residents in purchasing tires with their Texas distributors; (5) administering an interactive website for inquiries from Texas residents or tire distributors; (6) advertising on their website where their Texas distributors can be located; and (7) communicating regularly with their Texas distributors.

The trial court denied Appellant's special appearance, found Appellant's contacts with Texas satisfy the requisites of specific jurisdiction and this interlocutory appeal followed. The question is whether the State of Texas can assert personal jurisdiction over a non-resident defendant, Federal Corporation, a Taiwanese company, in this products liability suit. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

### *Federal Corporation, Inc.*

Appellant is a Taiwanese corporation; all their officers are Taiwan citizens, the board of directors has never held a meeting in Texas, nor have any of Appellant's business activities been controlled by any Texas person or entity. Appellant has never been a resident of Texas or authorized to do business in Texas, does not have a registered agent for service of process, or a license to do business in Texas. Appellant has never owned real or personal property in Texas;

2

does not maintain bank accounts in Texas; does not operate any facilities in Texas; does not pay income or employment tax in Texas; and does not have any employees, agents, sales representatives, or subsidiaries in Texas. Appellant also avers they have never transacted business in Texas, marketed their tires in Texas, advertised in Texas, designed or manufactured tires for sale in Texas, or manufactured other equipment for sale in Texas. Last, Appellant claims it has not established any channels for providing regular advice to customers in Texas nor marketed any tires through a distributor who has agreed to serve as a sales agent in Texas.

### *The Subject Tire*

The unchallenged evidence demonstrates this wrongful death case arose from an automobile accident in Ector County on July 22, 2013. Appellees here, plaintiffs and intervenors in the trial court, allege the cause of the accident was the failure of a Federal tire due to a tread separation. The alleged defective tire at issue, a Federal Couragia M/T 35 X 12.50 R18 LT, was designed and manufactured in Taiwan near the end of 2011. The subject tire, according to Appellees, was purchased at Tire Club USA of El Paso, Texas.

Mr. Dawu Chen, Appellant's director of Global Sales and Marketing, was deposed in January 2016. Chen was questioned regarding computer screen shots showing bar code numbers on tires which give Appellant the ability to track where a particular tire is sold within the United States. Documents referenced in his deposition show potential locations where Appellant shipped the subject tire from Taiwan. The bar code on the subject tire was incomplete and missing some digits; according to Chen, Appellant took the bar code numbers that *were* visible to find out all the potential bar code numbers which could apply, and where all of those potential tires were shipped. Only two possible tire types fit the bar code of the subject tire, and based on the information for

3

those two types, Appellant determined all of those two types of tires were "meant to be shipped" to Tire Dealers Warehouse in Phoenix, Arizona. However, Appellant cannot determine for sure whether those tires were in fact shipped only to Arizona.

### *Federal Tires Distributed in Texas*

Appellant admits it sells to two companies that distribute tires in Texas. One is Tire Dealer's Warehouse, which has its headquarters in Ohio. In a sworn declaration made by Chen and attached to Appellant's answer subject to its special appearance, Appellant acknowledges it manufactured the subject tire and sold it to Tire Dealer's Warehouse in Compton, California. According to Appellant, Tire Dealer's Warehouse in Compton, California, shipped the tire to its location in Phoenix, Arizona. The subject tire was sold "Free on Board" (F.O.B.) in Taiwan meaning that title to the tire is transferred to Tire Dealer's Warehouse at the time it was loaded on the ship in Taiwan. Appellant maintains Tire Dealer's Warehouse had exclusive control over the distribution and final destination of the subject tire once title transferred in Taiwan. Appellant contends they have no control or any involvement in the decision as to where Tire Dealer's Warehouse ultimately sends or sells the tire. However, Appellant admits that some of the tires sold to Tire Dealer's Warehouse have "eventually" made their way into Texas. Appellant asserts there is no evidence demonstrating Appellant placed the subject in the stream of commerce in Texas. According to Appellant, they did not intend or expect the subject tire would be sold in Texas or to a Texas resident. The second distributor is Dunlap & Kyle of Batesville, Mississippi, which includes Gateway Tires (Gateway) of Carrollton, Texas and Hesselbein Tires Southwest (Hesselbein) of San Antonio, Texas. Appellant ships tires purchased by Dunlap & Kyle directly to Gateway and Hesselbein. Appellant asserts they have no control or any decision making authority

4

regarding the ultimate destination of the tires sold to Dunlap & Kyle. All tire orders delivered to Gateway and Hesselbein are paid by Dunlap & Kyle.

Further, Appellant states they have no distribution agreement with any of the distributors and have never exercised control over the marketing practices of these distributors. Appellant asserts they have never made any direct sale to any end-user in Texas, and according to Chen, the number of tires shipped to Texas amounted to between .4% and 1.4% of Appellant's global sales.

Chen supervises Appellant's employees who communicate with Texas distributors. From 2009 through 2014, Appellant employed nine sales managers and team members who were responsible for Texas, including Charles Hsu and Elic Liu. These employees contacted Texas distributors directly and were responsible for ensuring Texas distributors had what they required and the shipping of their orders was correct. Mr. Chen, when asked if those distributors were selling tires in Texas, responded, "We don't know exactly what they do with our tires." On follow-up, he was asked whether tire facilities in Texas "would primarily be marketing to Texas customers . . . ?" Chen replied, "[W]e actually—we don't know every detail [of] what they do in Texas." Chen agreed distributors in Texas under parent company Dunlap & Kyle distributed Appellant's tires.

Documents in the record indicate Appellant contacted tire dealers in Texas to inquire about selling Federal tires. For example, Appellant's representative in Taiwan, Alex Lu, emailed Doug Robinson in Carrollton, Texas and "Mr. Mullino," in Mesquite, Texas, inquiring about whether they would be interested in selling Federal tire products. Chen testified the email indicates Appellant has several companies it ships its tires to, and Mr. Mullino could contact those companies to obtain Federal tires. Chen also clarified although Appellant's contract is with Dunlap

5

& Kyle in Mississippi, they ship directly to the state of Texas. Appellant also communicated with employees of Hesselbein and shipped tires directly to Hesselbein in Texas.

According to Chen, Appellant ships its tires to Texas, California, Oregon, South Carolina, and New Jersey, along with a few other states, but not all fifty states.

### *Delivery of Tires to Texas*

The record includes some twenty-nine sets of shipping documents of tires sold to Hercules Tire and Rubber of Ohio, but delivered to Tire Dealer's Warehouse's locations in San Antonio, Irving, and Houston, Texas. According to Appellant, Tire Dealer's Warehouse is a division of Hercules Tire and Rubber of Ohio. The invoices and shipping documents reflect the exporter is Appellant, while the importer is Hercules, and the terms are F.O.B. Taiwan with payment due sixty days from the bill of lading date. The invoices cover a period from March 23, 2013, through November 14, 2013, in which it appears 11,251 tires were sent. The sales total of twenty-eight of these invoices is approximately $1,144,174 for the nine-month period.

Another twenty-five invoices pertaining to Dunlap & Kyle reflect tires were shipped directly to either Carrollton or San Antonio, Texas. These tires were delivered to Gateway in Carrollton and Hesselbein in San Antonio. The invoices cover a period from April 30, 2013 through August 12, 2014 with 15,726 tires shipped to Texas. The sales total of twenty-three of the invoices is $1,743,159 for the sixteen-month period. The terms of the sale are "DDP Carrolton, Texas," or "DDP San Antonio, Texas," and payment is seventy-five days from bill of lading date.

Chen explained in his deposition that "DDP" means "delivery duty paid;" in other words, Appellant handles "the entire transportation including ocean transport and inland transport to the door of anywhere where our customer wants us" to deliver the tires. Chen stated when tires are

6

sold DDP, Appellant covers "the cost of the tire", and "inland transportation cost in Taiwan, ocean freight, and inland transportation cost in the United States, and import duty." Chen explained when tires are shipped in this manner, and if, for example, the container of tires is unloaded in California, the container is transported either by rail or truck to Texas. As the tires travel across Texas, they are owned by Appellant until they are delivered to their ultimate destination, and ownership transfers upon delivery. While Appellant's tires are in transit throughout Texas, Appellant insures the tires against loss or accident.

Chen explained that shipping documents and invoices for their products are prepared by Appellant. Chen pointed out the Texas distributors are not Federal tire dealers, but "[c]ompanies in Texas where we ship our tires." Chen when asked about the individual email recipients of Texas distributors, replied, "Well, we believe they are […] they are involved in Federal tires, but whether they stay there, we don't know exactly." When asked to clarify, he stated, "We don't know where they live, okay. We know they are working for those companies, and they are the ones that we need to maintain contact." When pressed, "You know that some of those people work in the state of Texas, true?" He answered, "I believe so. I can't just say that." Chen stated Federal maintains constant communications with businesses in Texas to handle the shipments.

Chen stated Appellant shipped tires to Texas after July 31, 2009 (the beginning of the discovery period), and in 2010, 2011, 2012, 2013. Chen further acknowledged Dunlap & Kyle, whom they invoiced for the shipped tires, have businesses in Texas to which Appellant ships Federal tires directly from Taiwan. Chen also stated many pertinent documents related to Appellant's shipping history in Texas are lost because Appellant does not adhere to any file retention policy because they do not have an interest in retaining documents.

### *Federal's Advertising and Marketing in Texas*

The record reflects, and Appellant does not dispute, it sent the following advertising materials to Dunlap & Kyle Co. Inc. On July 3, 2014, Appellant sent free of charge to Carrollton, Texas:

5 Couragia A/T Banners
2 Couragia F/X Banners
100 Tread Depth Gauge key chains
40 Mobile One Touch stands
100 stickers
60 Catalogues
50 Couragia XUV Flyers
50 Couragia M/T Flyers

Another invoice to Dunlap & Kyle reflects on July 24, 2013, free of charge, Appellant sent 14,000 cards to Carrollton, Texas, which the invoice described as a "promotional item."

In a March 5, 2010, email by Doug Robinson, sales manager at Gateway Tire of Texas, to Elic Liu, North American Team Executive, Global Sales Division, at Federal, Robinson asked, "I saw in the Tire Business magazine that you have showroom displays for the Federal line. Are these available to D & K?" Liu responded, "[I]n regards to the displays of Federal line, we are surely welcome you [sic] to have our image corner to be displayed in your retail store, that is also our new concept called 'store in store' for promoting Federal brand, kindly let me check with our marketing dept. for the details, and get back to you soon."

On July 1, 2010, in an email to Elic Liu at Federal from Doug Robinson at Gateway, Robinson asked for "more brochures, posters, stickers, banners, etc. sent to Farmers Branch." Robinson said "We are doing good with the [F]ederal line and our customers are asking for these." Liu replied, "You got it! I will try to arrange some of these promotional items into next available container to Farmers Branch, and we appreciate your efforts in making Federal brand more

valuable to the end-users." Robinson replied, "No problem Elic[,] I am happy to do so[.] Federal is a good tire and I look forward to a long relationship and you do a great job for us!!"

On January 21, 2014, Charles Hsu, Appellant's North American Sales Team Manager, Global Sales Division, sent an email to twenty individuals, including Robinson at Gateway and Chris Pope of Dunlap & Kyle in San Antonio, Texas, regarding a survey on Federal tires. The survey stated,

> Dear Valued Customer:
>
> Federal is planning to develop a new MT product that targets mainly at the pick up and sports utility market. We have tentatively set up 3 benchmarks and 28 sizes to fit the market demand. Furthermore, we would like to conduct a survey on benchmark products to enable an early finalization of our line up.

Included in the survey were numerous questions regarding the general opinion of the "present Couragia M/T." The survey asked for estimated demand for twenty-seven different types of Federal tires, including response options for annual quantities estimated and target prices.

The survey also included a one-page "Client Satisfaction Survey." The customer service survey provided five responses ranging from "below standard" through "excellent," and asked the recipient to rate fifteen categories of Appellant's products and services, including the following: service representatives' expertise, responsiveness, and claim adjustments; quality and design of promotional items, and advertising exposure, and delivery schedule and correctness. It also asked, "How often do you expect our service people to visit you?"

Chen discussed the survey in his deposition. According to him, the purpose of this "questionnaire" was to gauge demand for potential products Appellant may produce in the future, what the survey recipient thinks about Appellant's current products, and what products their customers need.

9

In an email sent March 4, 2010, Liu provided an updated price list with new released sizes to Dennis King, Richard Dunlap, and John King. The following day, Robinson asked Liu, "Could you do Howard and myself a big favor. For your EVO line in 18-20" fitments do you have a list of targeted vehicles. This would help us very much in deciding which tires to order and stock. You could also send a list of targeted OE replacement for the other tires too." Liu responds, "Please allow me a few days to gather the information of the fitment in our EVO line[.]" On March 13, 2010, Robinson emailed Liu "re: The fitment information" asking, "Any update?"

In October 2011, Liu sent an email to eleven individuals including Doug Robinson of Gateway and Terry Steinhouse of Hesselbein Tire in Lubbock, Texas. The email stated, "We are planning to change the speed rating for the size of 31 x 10.5 R15 M/T from R to Q rated. Please let us know would it be acceptable in your market." Steinhouse responds, "Would be ok with us."

A January 7, 2011 email from Chris Pope at Hesselbein in San Antonio, Texas, to Liu asks, "Please see if you can ship me another few hundred of these ASAP." In another email to Pope dated January 21, 2010, Liu states,

> Good day! Please find enclosed PI for both of [the] below orders, kindly sign and return to us for confirmation, please also double check with the price of 195/60 R15 88H-FD1, it should be [redacted], not [redacted] as appeared on your order form.

Liu also asks for the address of Hesselbein's warehouse in McAllen, Texas.

In another email regarding orders, Pope states, "The price of the 195/60R 15 is off but I need special pricing on that size. You do not offer it in the ss657 design. Please make this happen for me." Liu responds:

> Thank you for letting us know your below concern, please understand we have been facing the challenges in increasing trend of natural rubber (it is now [redacted]/ton), increase in freight costs (please [see] attached notice from shipping company), as well as devaluation of US dollars, all these giving us a great deal of pressure on our

10

costs. However, I have noticed, we have been receiving good orders from you, especially in PCR lines, and this is certainly a good start at the beginning of this year, we would like to see this momentum can be [sic] continued, in order to give you our best support and after thorough discussion with our managements, the best offer we can do is [redacted] for 1,000 units, please kindly bear with us in light of these obstacle [sic] we are trying to conquer.

Pope counters, "I really need better on that one size. Can you help?" Liu replies, "While waiting for your feedback on the 195/60 R15 (FD1), please advise if we could confirm you other sizes you were ordered into our system, so that we can start with production planning[.]"

Liu then writes:

As per our conversation on the phone, [redacted] will be confirmed offer for 195/60R 15 FDI, please do understand we do this for partnership and to support you with the full line purchasing, in addition this price will only [be] valid for these two orders (PO# HS 15902 & PO# HS 15904) only, as I have previously explained we have been facing a great challenge on our cost structure, hope you can understand that the more we sale at this price the more lost we get. Lastly, please resent [sic] the signed PI with the amended price, so that we can confirmed [sic] in to [sic] our system, thank you in advance!

Pope then indicates his approval via a subsequent email.

### Federal's Warranty on Tires Sold in Texas

Chen testified Federal has a process for warrantying its tires, which it grants to its distributors like Dunlap & Kyle, and is then "pass[ed] on to … the user [of the tire]." An email from Charles Hsu to Chris Pope on February 11, 2014, addresses the M/T tire warranty process. Hsu states:

[I]n the future, if you have any single MT claim [tire], we will provide you the warranty for a set of MT (although it shouldn't be happening more often than before since we have made the changes on MT), however, based on this MT warranty, we need a proof of invoice/receipt or any identification that you have had given your customer another set of MT as compensate in the future. Please don't take me wrong that I am not trusting you that you are giving a set of MT tire to your customer for compensate [sic], I know the way you are handling on the MT claim for your customer that even your customer had claim for 1 MT, you would still

11

compensate them for at least 2MT or even 1 set MT. Therefore, if there's any MT claim in the future, please claim them by following the claim procedure as usual but please make sure to include a proof of invoice/receipt or any identification so we can proceed the warranty for you.

An email dated December 29, 2011, from Scott A. Lyon of Hesselbein to Elic Liu attaches a PDF document referring to adjustment claims.

*Federal Representative Trips to Texas*

The evidence of travel by Federal employees to meet with Texas distributors is undisputed and the record contains copies of airline tickets, boarding passes, car rental receipts, and hotel receipts. The evidence in the record of Appellant's travel to Texas during the relevant discovery period includes the following dates, employees, and locations:

| April 12, 2010 | Liu, Anting | Boarding pass, Miami to Houston |
| August 4 | Liu, Anting | Boarding pass, Los Angeles to Dallas/Fort Worth |
| August 5 | Liu, Anting | Boarding pass, Dallas/Fort Worth to Detroit |
| August 7, 2011 | Liu, An Ting | Avis car rental receipt, Dallas/Fort Worth |
| August 7, 2011 | Liu, An Ting | Holiday Inn receipt, Dallas |
| August 7, 2011 | Liu, Anting | Boarding pass, Cleveland to Dallas/Fort Worth |
| August 8, 2011 | Liu, Anting | Checked baggage receipt, Dallas |
| August 8, 2011 | Liu, Anting | Holiday Inn receipt, Houston |
| August 8, 2011 | Liu, Anting | Boarding pass, Dallas/Fort Worth to Houston |
| August 9, 2011 | Liu, Anting | Checked baggage receipt, Houston |
| [illegible] | Liu, Anting | Boarding pass, Houston to San Francisco |

12

| | | |
|---|---|---|
| March 25, 2012 | Liu, Anting | Holiday Inn receipt, San Antonio |
| March 26, 2012 | Liu, Anting | Holiday Inn receipt, Addison |
| March 26, 2012 | Liu, Anting | Boarding pass, San Antonio to Dallas/Fort Worth |
| March 27, 2012 Worth to Los Angeles | Liu, Anting | Checked baggage receipt, Dallas/Fort |
| March 16-19, 2013 | Liu, Anting | Holiday Inn receipt, Addison |
| March 14 | Hsu, Mingte | Boarding pass, Detroit to San Antonio |
| March 18 Worth | Hsu, Mingte | Boarding pass, San Antonio to Dallas/Fort |
| March 19 Angeles | Hsu, Mingte | Boarding pass, Dallas/Fort Worth to Los |
| March 19, 2014 Worth | Hsu, Mingte | Checked baggage receipt, Dallas/Fort |

In addition, there are what appear to be ledger entries that purport to pay for the travel to Texas on the following dates: August 7-8, March 15-19, and March 25-26, in unspecified years. The places of travel in the ledger reflect Dallas, Houston, San Antonio, and Addison.

The record also contains emails discussing the proposed trips by Appellant's employees. Charles Hsu, the North America Sales Team Manager, Global Sales Division, emailed Chris Pope at Dunlap on February 20, 2014 asking if they could meet on March 19 in San Antonio. Pope replied, "Yes[,] I will be in the [S]an Antonio office that day." A second email from Hsu advises Doug Robinson of Dunlap in Carrollton that he would like to meet on March 18.

Chen testified employees and representatives of Appellant traveled to Texas to meet with "companies where [Appellant] send[s] the tires to," to identify areas where improvement can be

13

made, and to address other needs those companies may have where Appellant can assist. These companies include Gateway and Hesselbein. When asked if Gateway and Hesselbein sell tires in the state of Texas, Chen replied, "I don't know what they actually do in Texas, but maybe, yes." Chen admitted Appellant ships its tires to distributors located in Texas, but denied knowing whether the tires would actually be sold in Texas. He stated only that it was "possible" Federal tires were sold in Texas. He testified later in his deposition that one purpose of traveling to Texas was to increase Appellant's shipments and sales in Texas.

Chen acknowledged Federal sales managers and team members make trips to Texas once or twice a year. He identified three current employees who have visited the Texas distributors, including Charles Hsu and Elic Liu. He confirmed in 2014, Charles Hsu traveled to Texas. These business trips, according to Mr. Chen, are undertaken by a Federal sales manager, who may also be accompanied by a sales team member. Mr. Chen agreed Appellant's employees travel to Texas as the result of their relationship with the distribution centers in Texas.

*Interactive Website*

**Texas Consumers**

The record includes several pages of screenshots of Appellant's website. Several of the screen shots show a website page entitled "DISTRIBUTION MAP" and states, "Welcome to our Distributor Locator! Please visit the website of our distributor(s) in your area to find their dealer(s)/retailer(s) nearest you!"

The first screenshot depicting the distribution map in Texas displays a map with numbers of different locations throughout Texas. The page lists seven locations in Texas: four Dunlap & Kyle Company locations, and three Tire Dealer's Warehouse locations. The screen shot also lists

the following cities in Texas where Federal tires are sold: Farmers Branch, Houston, Irving, Lubbock, McAllen, and San Antonio.

## Texas Distributors

In December 2009, an Alex Nucci, CEO, from Addison, Texas, emailed Appellant from the website, asking:

> I would like to become a direct dealer for Federal tires, but I can't find any contact information for you guys other than this email address and your online contact form. I would like for someone from your sales team, that deals with Dallas, TX, area, to please contact me.

Liu forwarded the email to Robinson at Gateway Tire stating, "Hi Doug, Please refer below inquiry from Dallas, kindly handle it for us, thank you in advance!" Robinson responded, "Elic, [t]hank you very much for sending me this lead and Federal[']s position to support Gateway Tire in the Dallas market. If you get anymore inquires [sic] send them our way. I will follow up with this lead and hopefully we can sell him some tires." Liu wrote back:

> You are very welcome, I believe a good partnership is [sic] start with faith and trust, and a good relationship need [sic] to put in effort to earn it, we believe you can represent us well in that region, and hope the Federal brand can also grow along the way. One thing you can be rest assure[d] that any future inquiries, we will direct to you to handle it.

> Yes! We also looking forward to see you sell him tires, so that we can grow together too.

In August 2010, Dax Winzenried, of Sanders Tires and Wheels from Palestine, Texas submitted an inquiry to Appellant through their website. Kevin Chen, an employee of Appellant, sent an email to Robinson stating, "For your reference, below is a retailer that seems to be interested in buying Federal Tires. Thanks in advance if you can assist him!" Robinson replied, "Thank you for the lead. This gentleman is a new hire at Sanders Tire in Palestine who was trying

15

to buy small quantities direct from Federal and I appreciate you guys forwarding the lead back to us. We have sold Sanders Tire Federal tires for several years now and will continue to do so. We will follow up with Dax and the owner this morning."

### *Trial Court's Findings of Fact and Conclusions of Law*

The trial court entered seventy-five findings of fact and six conclusions of law. Appellant asserts "each of the trial court's factual findings are against the great weight and preponderance of the evidence, or, alternatively supported by insufficient evidence[.]" Appellant raises a no-evidence or insufficient-evidence challenge to the following findings of fact:

8. Federal Corporation placed the subject tire into the stream of commerce in the United States.

9. The Estate of Laura Janeth Alvarez has pleaded that she bought the subject tire in Texas and there are no pleadings or evidence to date that contradicts that assertion.

10. Federal Corporation is aware and intends that its tires are being sold specifically in Texas, and this has been true for years.

.                  .                  .

12. Federal Corporation has represented that Federal has 'many agents and distributors in the [United] States.'

13. Federal Corporation has a number of distributors in Texas, including Gateway Tire of Texas, Hesselbein Tire, and Tire Dealer's Warehouse, that it communicates directly with and receives information directly from on an ongoing basis in an effort to increase sales of Federal tires specifically in Texas.

14. Federal Corporation refers to various tire distributors located in Texas as Federal Corporation's 'distributors' on Federal's interactive website ['Welcome to our Distributor Locator!/Distribution Map'], and in emails that Federal Corporation has produced that are before the Court.

15. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on various emails produced by Federal Corporation,

Federal Corporation has a distributor of Federal tires located in Carrollton, Texas (Gateway Tire of Texas).

16. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has a distributor of Federal tires located in Farmer's Branch, Texas (Dunlap & Kyle Company).

17. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has a distributor of Federal tires located in Houston, Texas (The Dealer's Warehouse).

18. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has a distributor of Federal tires located in Irvin, Texas (Tire Dealer's Warehouse).

19. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has a distributor of Federal tires located in Lubbock, Texas (Dunlap & Kyle Company).

20. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has a distributor of Federal tires located in McAllen, Texas (Dunlap & Kyle Company).

21. Based on its interactive website, accessible by Texas consumers and potential Texas tire dealers, and based on emails produced by Federal Corporation, Federal Corporation has two distributors of Federal tires located in San Antonio, Texas (Hesselbein Tire Southwest and Dunlap & Kyle Company).

.        .        .

27. Federal Corporation sales representative routinely travel from Taiwan to Texas once or twice each year to meet with Federal's Texas distributors of Federal tires.

28. Federal Corporation markets its tires directly in Texas.

29. Federal Corporation sends Federal tire advertising materials and promotional items that include banners, signs, placards, and other items, directly to its distributors in Texas to increase sales of Federal tires in Texas.

30. Federal Corporation produces and sends these advertising and promotional materials from Taiwan to Texas at its own expense, and does not charge the distributors for them.

.          .          .

33. Federal Corporation solicits opinions from its Texas distributors of Federal tires regarding whether or not to change the speed rating on a particular model of Federal tire.

34. Federal Corporation has an interactive website through which it solicits inquiries from potential distributors and consumers in Texas, and Federal representatives in Taiwan respond directly to Texas residents when sales inquiries are made by Texas residents.

35. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Alvarado, Texas in the five-year period of discovery allowed by the Court.

36. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Angleton, Texas in the five-year period of discovery allowed by the Court.

37. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Brownsville, Texas in the five-year period of discovery allowed by the Court.

38. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Brownwood, Texas in the five-year period of discovery allowed by the Court.

39. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Conroe, Texas in the five-year period of discovery allowed by the Court.

40. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Corpus Christi, Texas in the five-year period of discovery allowed by the Court.

41. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Dallas, Texas in the five-year period of discovery allowed by the Court.

42. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from El Paso, Texas in the five-year period of discovery allowed by the Court.

43. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Galveston, Texas in the five-year period of discovery allowed by the Court.

44. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from George West, Texas in the five-year period of discovery allowed by the Court.

45. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Gun Barrel City, Texas in the five-year period of discovery allowed by the Court.

46. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Hewitt, Texas in the five-year period of discovery allowed by the Court.

47. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Lake Jackson, Texas in the five-year period of discovery allowed by the Court.

48. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Laredo, Texas in the five-year period of discovery allowed by the Court.

49. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire

dealer inquiries from Longview, Texas in the five-year period of discovery allowed by the Court.

50. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from McKinney, Texas in the five-year period of discovery allowed by the Court.

51. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Mesquite, Texas in the five-year period of discovery allowed by the Court.

52. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Ozona, Texas in the five-year period of discovery allowed by the Court.

53. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Palestine, Texas in the five-year period of discovery allowed by the Court.

54. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Pearland, Texas in the five-year period of discovery allowed by the Court.

55. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Ponder, Texas in the five-year period of discovery allowed by the Court.

56. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Rosenberg, Texas in the five-year period of discovery allowed by the Court.

57. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from San Antonio, Texas in the five-year period of discovery allowed by the Court.

58. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Sanger, Texas in the five-year period of discovery allowed by the Court.

59. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Tomball, Texas in the five-year period of discovery allowed by the Court.

60. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Tyler, Texas in the five-year period of discovery allowed by the Court.

61. Based upon documents and emails that Federal Corporation has produced in discovery, Federal has, through its interactive website, fielded end user and/or tire dealer inquiries from Wichita Falls, Texas in the five-year period of discovery allowed by the Court.

62. Federal Corporation representatives in Taiwan solicit, respond and communicate directly to potential tire-buying customers in El Paso, Texas.

63. Federal Corporation has established channels of regular communication with Texas customers.

.            .            .

65. Federal Corporation pays sales tax in Texas in connection with its various business-related trips to Texas to promote its tire sales.

.            .            .

67. Federal Corporation has purposefully availed itself of the privilege of conducting business activities within Texas involving the sale of Federal tires in Texas.

68. Federal Corporation has intentionally targeted Texas as a marketplace for its products, Federal tires.

69. Federal Corporation has made numerous intentional efforts to serve the tire market in Texas.

70. Federal Corporation has placed Federal tires into the stream of commerce knowing that many of them will reach Texas.

71. It is not unduly burdensome on Federal Corporation to be subject to the jurisdiction of a Texas Court, and Federal Corporation did not offer any contrary proof of an alternative less burdensome forum.

72. Texas has an interest in adjudicating this dispute, which involves an incident in Texas that Texas citizens contend was the cause of death and injuries to Texas citizens, and Federal Corporation did not offer any contrary proof that Texas does not have such an interest.

73. The Plaintiff's in this case have an interest in obtaining convenient and effective relief, and Federal Corporation did not offer any contrary proof to the contrary.

74. The Court's exercise of jurisdiction over Federal Corporation will benefit the judicial system's interest in obtaining the most efficient resolution of controversies, and Federal Corporation did not offer any contrary proof of a more efficient forum for resolving this controversy.

75. The Court's exercise of jurisdiction over Federal Corporation will benefit the judicial system's interest in furthering fundamental substantive social policies, and Federal Corporation did not offer any contrary proof to the contrary.

The unchallenged findings are as follows:

1. This case arises out of an automobile crash that occurred in Ector County, Texas on July 22, 2013.

2. On July 22, 2013, Laura Janeth Alvarez, a Texas resident, was driving a Ford F-150 pickup that was equipped with a Federal Couragia M/T 35 X 12.50 R18 L/T tire ('the subject tire').

3. The Plaintiffs' contentions include that, due to a defect in the subject tire, it suffered a failure that caused Ms. Alvarez to swerve into oncoming traffic and collide with another vehicle, causing the Plaintiffs' various injuries and damages.

4. Federal Corporation, a Taiwanese corporation, is the designer and manufacturer of the subject tire.

5. Plaintiffs brought this product liability suit against, among others, Federal Corporation.

6. Plaintiffs assert that this Court has specific jurisdiction over Defendant Federal Corporation, and Defendant Federal Corporation asserts that it is not subject to the jurisdiction of this court.

7. Jurisdictional discovery was conducted in this matter for the five-year period preceding the filing of this lawsuit: July 31, 2009 – July 31, 2014.

.               .               .

11. Federal Corporation is well aware that its Couragia M/T 35 X 12.50 R18 LT tire has repeatedly been sold in Texas for years.

.               .               .

22. Federal Corporation sends price lists for its tire directly to the distributors of its tires in Texas.

23. Federal Corporation provides price discounts to its distributors of Federal tires in Texas.

24. Federal Corporation ships tires directly from Taiwan into Texas at the request of Federal's distributors located in Texas.

25. Federal Corporation makes many of its shipments of tires from Taiwan into Texas 'Delivery Duty Paid' (DDP), under which the title to the tires does not transfer from Federal Corporation to its Texas distributor until the tires reach their destination within Texas.

26. Federal Corporation commonly transports tires *that it owns* over the highways and railways of Texas, transferring title to those tires only when they reach their destination within Texas.

.               .               .

31. Federal Corporation conducts market research on its tires in Texas.

32. Federal Corporation solicits opinions from its Texas distributors of Federal tires regarding the various types of tires that Federal should place into the tire market in Texas.

.               .               .

64. Federal Corporation warrants its tires that are on the road in Texas.

23

. . .

66. Federal Corporation purchases insurance on personal property that it owns that is located in the State of Texas (Federal tires).

The trial court concluded that Federal satisfied the requirements of specific jurisdiction to allow the lawsuit to proceed against Federal and denied their plea to the jurisdiction.

## DISCUSSION

In seven issues, Appellant challenges the trial court's exercise of personal jurisdiction over them. In their first issue, Appellant asserts the trial court's finding of jurisdiction is legally and factually insufficient. Second, Appellant argues the findings of fact are inapplicable in a special appearance proceeding and not binding upon this Court. Appellant's view is the "mixed factual and sufficiency/*de novo* review" is the proper standard. Third, in attacking the legal and factual sufficiency, Appellant urges that the evidence is insufficient to establish personal jurisdiction because their contacts with Texas show they did not purposefully avail themselves, the claims do not arise from any contacts supporting specific jurisdiction, and traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction in this case.

Fourth, Appellant asserts Appellees have waived their general jurisdiction claim and Appellant does not meet specific jurisdiction under these facts. Fifth, Appellant claims there is no jurisdiction under the "stream of commerce-plus" standard. Sixth, according to Appellant, even if general jurisdiction had not been waived, Texas cannot exert general jurisdiction over Appellant and Appellees have "muddl[ed] the distinction" between general and specific jurisdiction. Last, Appellant urges that the trial court's findings are legally and factually insufficient or against the great weight and preponderance of the evidence.

24

Appellees respond the evidence is legally and sufficient for the trial court to exercise personal jurisdiction over Appellant. Further, they assert the findings of fact and conclusions of law are appropriate, and legally and factually supported. Appellees state they have continuously asserted personal jurisdiction over Appellant cannot be based on general jurisdiction, only specific jurisdiction. Appellees contend that Appellant "targets Texas as a marketplace for its products, has sufficient, and ongoing purposeful contacts with Texas, [and] the claims arise from these contacts supporting specific jurisdiction[.]" Moreover, "the exercise of jurisdiction over [Appellant] does not offend traditional notions of fair play and substantial justice." In addition, Appellant's activities satisfy the "stream of commerce-plus" test.

Appellant's seven issues can be most efficiently addressed by consolidating them as follows:

(1) Whether this Court can consider the trial court's findings of fact regarding jurisdiction, and how the findings should be reviewed on appeal (Appellant's second issue);

(2) Whether Appellees allege, and the evidence sufficiently demonstrates, general jurisdiction applies (Appellant's fourth and sixth issues);

(3) Whether the trial court's findings of fact are legally and factually sufficient (Appellant's seventh issue) to support the trial court's finding of specific jurisdiction (Appellant's first, third, and fifth issues).

We proceed with our analysis in that order.

### *Standard of Review*

The threshold issue of personal jurisdictional in this case presents a question of law, and a trial court's decision on special appearances is reviewed *de novo. BMC Software Belgium v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002); *Searcy v. Parex Resources, Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). A plaintiff shoulders the initial burden of sufficiently pleading allegations that allow

a court's exercise of personal jurisdiction over the nonresident defendant. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex. 2002). If the plaintiff meets this burden, the burden then shifts to the defendant to negate all potential bases for personal jurisdiction that plaintiff has alleged. *Id.* However, in answering this question of law, trial courts must frequently resolve questions of fact. *BMC Software,* 83 S.W.3d at 794. In resolving jurisdictional issues, appellate courts may be called upon to review the trial court's resolution of a factual dispute. *Id*. If the trial court enters findings of fact and conclusions of law, as was the case here, the appellant may challenge the findings of fact on legal and factual sufficiency grounds, but we review the conclusions of law *de novo*. *Id*.; *see also Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 634 (Tex.App.—Dallas 1993, writ denied); *Hotel Partners v. Craig,* 993 S.W.2d 116, 120-21 (Tex.App.—Dallas 1994, pet. denied). Unchallenged findings of fact are binding upon the appellate court. *Hotel Partners*, 847 S.W.2d at 632; *see also Davey v. Shaw,* 225 S.W.3d 843, 849 (Tex.App.—Dallas 2007, no pet.)("When a trial court's findings of fact are unchallenged on appeal, they occupy the same position and are entitled to the same weight as the verdict of a jury.")(*citing McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex. 1986)). "They are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard,* 722 S.W.2d at 696.

When an appellant advances a factual sufficiency challenge, we examine the entire record, considering the evidence in favor of, and contrary to, the challenged finding. *Horowitz v. Berger,* 377 S.W.3d 115, 122 (Tex.App.—Houston [14th Dist.] 2012, no. pet.); *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998); *Morris v. Kohls-York*, 164 S.W.3d 686, 692 (Tex.App.—Austin 2005, pet. dism'd). The court may set aside a finding only if the finding is so

contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Washington DC Party Shuttle, LLC v. 1Guide Tours,* 406 S.W.3d 723, 729 Tex.App.—Houston [14th Dist.] 2013, pet. denied). When there is a legal sufficiency challenge, if more than a scintilla of evidence exists to support the questioned finding, the no-evidence point fails. *BMC Software,* 83 S.W.3d at 794; *see also City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005).

Appellant, in their second issue, argue that trial court's findings of facts are inapplicable in a special appearance proceeding, are not binding upon us, and subject to a factual and legal sufficiency review. Appellant has not provided any case involving a special appearance in which findings of fact have been declared inapplicable. The only case they cite to involving a special appearance states, "[w]e may review the trial court's resolution of disputed fact issues for legal and factual sufficiency under the same standards of review that we apply in reviewing a jury verdict." *In re Estate of Davis*, 216 S.W.3d 537, 544 (Tex.App.—Texarkana 2007, pet. denied)(*citing TravelJungle v. Am. Airlines, Inc.,* 212 S.W.3d 841, 845 (Tex.App.—Fort Worth 2006, no pet. h.); *Michel v. Rocket Eng'g Corp.,* 45 S.W.3d 658, 668 (Tex.App.—Fort Worth 2001, no pet.). Like our sister court in Dallas found in *Hotel Partners* and *Davey*, we conclude that findings of fact may be made in a special appearance proceeding; further, if a finding is unchallenged, it is binding upon us unless there is no evidence to support that finding or the opposite is established as a matter of law. *Hotel Partners*, 847 S.W.2d at 634; *Davey,* 225 S.W.3d at 849; *McGalliard,* 722 S.W.2d at 696. We overrule Appellant's second issue.

### *Applicable Law*

We review the propriety of a trial court's exercise of personal jurisdiction upon a non-

resident defendant under both federal and state law. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574-75 (Tex. 2007); *see International Shoe Co. v. State of Wash., Office of Unemployment,* 326 U.S. 310, 316 (1945); TEX.CIV.PRAC.&REM.CODE ANN. §§ 17.041-.45. Texas state courts can exert personal jurisdiction over a defendant when two criteria are satisfied: (1) the Texas long arm statute must grant jurisdiction; and (2) the exercise of jurisdiction must comport with federal and state constitutional guarantees of due process. *Moki Mac*, 221 S.W.3d at 574. The Texas long arm statute provides for personal jurisdiction which extends to the limits of the United States Constitution; thus, federal due process requirements necessarily outline the contours of our jurisdictional reach. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991).

Under *International Shoe Company v. Washington,* whether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice. *Int'l Shoe Co.,* 326 U.S. at 316; *BMC Software,* 83 S.W.3d at 795. Sufficient minimum contacts exist when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)(quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)).

There are two kinds of personal jurisdiction: specific and general. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016). Appellees do not allege general jurisdiction applies to this case, arguing only that specific jurisdiction applies. Appellant's fourth and sixth issues are thus

overruled.

Specific jurisdiction is applicable when a defendant's contacts are "'isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state.'" *Spir Star AG v. Kimich,* 310 S.W.3d 868, 873 (Tex. 2010)(*quoting* 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002). A finding of specific jurisdiction requires (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *Retamco*, 278 S.W.3d at 338.

At the heart of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas is such that it could reasonably anticipate being subject to the jurisdiction of Texas state courts. *Spir Star AG*, 310 S.W.3d at 873. Purposeful availment involves contacts in which sellers reach into a particular forum and "create continuing relationships" which under specific jurisdiction could allow them to be sued in that forum as a result of their activities. *Id*. In a specific jurisdiction analysis, "we focus the minimum-contacts analysis on the 'relationship among the defendant, the forum and the litigation.'" *Moki Mac*, 221 S.W.3d at 575-76 (*quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 228 (Tex. 1991). There are three aspects of purposeful availment applicable to the minimum contacts analysis. First, only the defendant's contacts with the forum count. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76 (1985). Second, the acts relied on must be "purposeful" rather than fortuitous. *Id.* Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. *Id.*

The "stream of commerce" analysis is often utilized in product liability cases. *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy,* 508 S.W.3d 569, 576 (Tex.App.—El Paso

29

2016, no pet.)(*citing World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297-98 (1980)). Under *Volkswagen*, personal jurisdiction is proper over a non-resident corporation that places its products in the "stream of commerce" expecting that residents of the forum state will purchase them and forum residents are injured by those products. *Id.* The U.S. Supreme Court in *Asahi Metal* clarified that the placement of a particular product into the stream of commerce is not sufficient in and of itself to allow a forum to exert jurisdiction simply because the product was found there. *Asahi Metal Ind. Co., Ltd. v. Superior Court of Calif., Solano County,* 480 U.S. 102, 112 (1987)(plurality opinion). Texas precedent follows Justice O'Connor's plurality opinion in *Asahi Metal* requiring "additional conduct" that indicates "**an intent or purpose to serve the market in the forum State**." *See Spir Star*, 310 S.W.3d at 873 (*quoting Asahi Metal,* 480 U.S. at 112)[Emphasis added]; *Moki Mac,* 221 S.W.3d at 577. The *Asahi Metal* Court offered four examples of "additional conduct:" (1) "designing the product for the market in the forum State," (2) "advertising in the forum State," (3) "establishing channels for providing regular advice to customers in the forum State," and (4) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi Metal*, 480 U.S. at 112; *see also Spir Star AG,* 310 S.W.3d at 873; *Semperit,* 508 S.W.3d at 577. In *Semperit,* we found the "additional conduct" element was satisfied by a distribution network that garnered millions of dollars to the non-resident corporation from sales to Texas consumers, specially branding the product at issue for a single distributor that targeted Texas and shipping a substantial amount of their product to Texas. *Semperit,* 508 S.W.3d at 584.

The Texas Supreme Court in *Searcy* recognized that a nonresident defendant's contacts must be intentional. *Searcy,* 496 S.W.3d at 85 (*citing Walden v. Fiore,* 571 U.S. 277, 286 (2014)).

However, a non-resident defendant does not necessarily have to "*physically* enter the forum State" to establish minimum contacts. *Burger King Corp.,* 471 U.S. at 476; *see also Walden,* 571 U.S. at 283 (recognizing that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to give rise to specific jurisdiction). Simply directing communications into a forum can satisfy sufficient minimum contacts for jurisdiction. *See Burger King Corp.,* 471 U.S. at 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."). Non-resident defendants, while conducting business in a state, cannot use instruments of technology to defeat jurisdiction as the result of their purposeful contacts with the forum. *See Retamco,* 278 S.W.3d at 339 ("[W]hile [the nonresident defendant] may not have actually entered the state to purchase this real property, '[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state.'")(quoting *Burger King Corp.,* 471 U.S. at 476)).

The second prong of specific jurisdiction is the nexus requirement; that is, the non-resident defendant's contacts with the forum must give rise to the underlying litigation or relate to it in some way. *Moki Mac,* 221 S.W.3d at 579; *Int'l Shoe Co.,* 326 U.S. at 317. Generally speaking, specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contact with the forum. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 795 (Tex. 2005); *Spir Star AG,* 310 S.W.3d at 873. This includes benefits, profits, or some advantage from the forum derived by the defendant. *Michiana*, 168 S.W.3d at 785. *Moki Mac* instructs us that there must be a "substantial connection" between the non-resident defendant's contacts and the operative facts that impact the issues in the underlying lawsuit. *Id.* at 585-88.

31

In *Semperit,* after an extensive analysis of products liability cases through the prism of specific jurisdiction, we concluded that an operative fact on this type of litigation is whether the defendant is engaged in the business of selling the product at issue. *Semperit*, 508 S.W.3d at 584 (*citing McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788 (Tex. 1967)). We also declined to adopt a bright line rule that "requires the manufacturer to have sold the actual product which is the subject of the litigation in the forum state[.]" *See Semperit*, 508 S.W.3d at 584. Our reasoning was, "[i]f a manufacturer sold millions of dollars of goods in a Texas brick and mortar store, we cannot perceive that the manufacturer could properly challenge jurisdiction simply because a Texas customer happened to buy the same item on-line (as through Amazon or the like) and the actual sale is consummated from an out-of-state distributor." *Id*. Such a rule "would require the on-line consumer to seek relief in whatever state the product might have been shipped from." *Id.* In *Semperit*, we envisioned a more reasonable, flexible approach that does not look solely to where the individual product was sold or delivered, but a policy in accord with *Moki Mac*. *Semperit*, 508 S.W.3d at 584.

Since the submission of this appeal, the Texas Supreme Court again addressed specific jurisdiction in *Luciano v. SprayFoamPolymers.com, LLC*, No. 18-0350, 2021 WL 2603840, at *3 (Tex. June 25, 2021). With particular regard to the "substantial connection" issue, the Court referenced the United States Supreme Court's decision in *Ford Motor Co.*, where the high court stated, "'[n]one of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do.'" *Luciano*, 2021 WL 2603840, at *8 (*citing Ford Motor Co. v. Montana Eighth Judicial District*, 141 S.Ct. 1017, 1026 (2021)). Rather, "due process demands that a suit 'arise out of or *relate to*' the defendant's contacts with the forum[;]"

and in making such an inquiry, "arise out of" considers causation, whereas "relate to" "'contemplates that some relationships will support jurisdiction without a causal showing.'" *Luciano*, 2021 WL 2603840, at *9 (*quoting Ford Motor Co.*, 141 S.Ct. at 1026).

The third step of personal specific jurisdiction is whether the exercise of that jurisdiction offends the "traditional notions of **fair play and substantial justice**." *International Shoe Co.,* 326 U.S. at 316 [Emphasis added]. Once a court determines a nonresident defendant has purposefully established minimum contacts, only in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice. *See Guardian,* 815 S.W.2d at 231. In a special appearance, the defendant bears the burden of presenting "'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Guardian,* 815 S.W.2d at 231 (quoting *Burger King Corp.,* 471 U.S. at 477).

*Analysis*

**Legal and Factual Sufficiency of the Findings of Facts Supporting Specific Jurisdiction**

Chen's deposition testimony acknowledges that Appellant intended to ship the subject tire to Tire Dealer's Warehouse in Phoenix, Arizona, despite acknowledging he did not have a way to confirm for certain whether that occurred. We find the evidence legally and factually sufficient to support finding of fact #8.

The pleadings of Appellee Carlos Alvarez, executor of the estate of Laura Janeth Alvarez allege she bought the subject tire at Tire Club USA, Inc. in El Paso, Texas. The record contains no evidence to contradict that assertion. We find the evidence legally and factually sufficient to support finding of fact #9.

Appellant is aware and regularly ships its tires to Texas as evidenced by the invoices in the record and Chen's deposition testimony that Appellant has shipped tires to Texas in years 2009 through 2013. Appellant intends for its tires to be sold in Texas as evidenced by the emails forwarded to their Texas distributors for and on behalf of the end-users. We find the evidence legally and factually sufficient to support finding of fact #10.

Appellant has represented that it has "many agents and distributors in the [United] [S]tates" by their website, emails, and Chen's affidavit and deposition. We find the evidence legally and factually sufficient to support finding of fact #12.

Appellant ships tires from Taiwan to Gateway, Hesselbein, and Tire Dealer's Warehouse as evidenced by the invoices, shipping documents, and Chen's deposition testimony. The emails in the record demonstrate that the Appellant's sales team regularly communicates with individuals regarding increasing sales of Federal tires in Texas. We find the evidence legally and factually sufficient to support finding of fact #13.

Appellant makes references on its website to tire distributors located in Texas as Federal Corporation's "distributors" on its interactive website ["Welcome to our Distributor Locator!/Distribution Map"], and in various emails. We find the evidence legally and factually sufficient to support finding of fact #14.

Based on Appellant's website, accessible by Texas consumers and potential Texas tire dealers, and emails in the record and Chen's deposition testimony, Appellant has a distributor of its tires in Carrollton, Texas (Gateway Tire of Texas); Irving, Texas (Tire Dealer's Warehouse); Farmer's Branch, Texas (Dunlap & Kyle Company); Houston, Texas (Tire Dealer's Warehouse); Lubbock, Texas (Dunlap & Kyle Company); McAllen, Texas (Dunlap & Kyle Company); San

Antonio, Texas (Hesselbein Tire Southwest and Dunlap & Kyle Company). We find the evidence legally and factually sufficient to support findings of fact #15 through #21.

Chen testified in his deposition that Federal sales managers and team members travelled to Texas to meet with Texas distributors of their tires at least once or twice a year. The record also supports those trips with travel documents and emails of Federal employees meeting with their tire distributors in Texas. We find the evidence legally and factually sufficient to support finding of fact #27.

Appellant's marketing efforts to Texas are evidenced by the emails to potential end-users and tire distributors, marketing materials sent to their tire distributors, surveys, and website representations lead to the conclusion that Appellant markets their tires to Texas. We find that the trial court's finding that Appellant marketed its tires directly is not contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. The evidence is legally and factually sufficient to support finding of fact #28.

Appellant's invoices and Chen's testimony unequivocally showed that advertising and promotional materials were sent to Texas distributors. Further, the record reflects these items were sent at Appellant's expense and no reimbursement was required by Texas distributors. Given the amount and variety of advertising materials sent to Texas, it is not unreasonable to conclude the purpose is to increase sales of Federal tires in Texas. The evidence is legally and factually sufficient to support findings of fact #29 and #30.

Appellant solicited their Texas distributors for opinions regarding modifying speed rating of a Federal tire sold in Texas as evidenced by emails in the record. The evidence is legally and factually sufficient to support finding of fact #33.

Appellant's website permits potential end-users and distributors to make inquiries regarding Federal tire sales in Texas. Federal sales representatives in Taiwan respond directly to these inquiries from Texas residents. The evidence in the record reflects inquiries were received from Texas residents from Alvarado, Texas; Angleton, Texas; Brownsville, Texas; Brownwood, Texas; Conroe, Texas; Corpus Christi, Texas; Dallas, Texas; El Paso, Texas; Galveston, Texas; George West, Texas; Gun Barrel, Texas; Hewitt, Texas; Lake Jackson; Laredo, Texas; Longview, Texas; McKinney, Texas; Mesquite, Texas; Ozuna, Texas; Palestine, Texas; Pearland, Texas; Ponder, Texas; Rosenberg, Texas; San Antonio, Texas; Sanger, Texas; Tyler, Texas; Wichita Falls, Texas. The evidence is legally and factually sufficient to support findings of fact #34 through #61.

Appellant, as evidenced by the emails in the record, solicits, respond, and communicate with potential end-users in El Paso, Texas. The record indicates Appellant, through its website, established a channel of communication with Texas' end-users. The evidence is legally and factually sufficient to support findings of fact #62 and #63.

The record has proof of at least one instance where Appellant paid sales tax in Texas arising from their business-related trips to Texas when it paid taxes on its hotel room on a trip to Addison. Additionally, Chen's testimony indicated at least one reason for these trips was to increase its sales in Texas. We find that the trial court's finding that Appellant paid sales tax in Texas arising from their business-related trips to Texas to increase tire sales in Texas is not contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. The evidence is legally and factually sufficient to support finding of fact #65.

**Stream of Commerce-Plus**

The evidence in the record is replete with instances in which Appellant exhibited a pattern of behavior that leads to the conclusion that Appellant purposefully availed itself of Texas' jurisdiction. Viewing the evidence as to Appellant and its contacts with Texas, we find that Appellant purposefully availed itself of the benefits of doing business in Texas.

First, Appellant's contacts were not isolated or sporadic, as shown by the invoices to Tire Dealer's Warehouse and Dunlap, the number of tires shipped to Texas, and the millions of dollars earned by Appellant from sales of their tires in Texas. *See Spir Star AG,* 310 S.W.3d at 873; *Semperit*, 508 S.W.3d at 581. Appellant's contacts were not based solely upon "random," "fortuitous," or "attenuated" contacts or the "'unilateral activity of another party or a third person.'" *Burger King Corp.,* 471 U.S. at 475; *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 417 (1984); *Volkswagen Corp.,* 444 U.S. at 298. Appellant benefitted from the sales of their tires in Texas and benefitted from the use of Texas' infrastructure to transport their product to market by rail and state highway in order to reach the locations of their tire distributors around the state.

Under Texas' "stream of commerce-plus" analysis, we focus on "**an intent or purpose to serve the market in the forum State**." *Spir Star AG,* 310 S.W.3d at 873 [Emphasis added]. Here, the record demonstrates Appellant intentionally targeted Texas for sales of their tires. Although Appellant was not a direct retailer of their tires in Texas, they endeavored like any successful business to support their customer base in areas where their products were sold. It is undisputed the tires were shipped directly to Texas. Appellant routinely forwarded emails from potential Texas consumers and tire dealers to Dunlap to follow-up with the hopes of effectuating the sale of Appellant's product. In addition, the assorted promotional materials of 14,000 cards, sixty

catalogues, and more than one hundred tire gauge key chains supported Appellant's endeavor to sell tires in Texas. Visiting the individuals responsible for ordering Appellant's tires in Texas by Appellant's *sales managers* up to twice a year cannot lead to any other conclusion other than Appellant targeted Texas residents for sales of their tires. In his deposition, Chen repeatedly disputed that idea, insisting the business trips were for the sole purpose in ascertaining whether shipments were arriving on time, but that exceeds the bounds of credibility given those matters are easily addressed by email and do not normally require personal face to face interactions. In fact, as the record demonstrates, Federal employees in Taiwan regularly contacted Texas distributors regarding the timing of shipments. It is clear from the number of tires shipped to Texas distributors that Appellant cannot claim it was unaware their tires entered the stream of commerce in Texas. Appellant's support of sales in Texas included sending emails regarding sales leads to their tire distributors which benefitted Appellant and their tire distributors. Appellant also warrants the tires they sell through their Texas distributors. Appellant intended and purposefully served their market in Texas.

Appellant argues that consideration of an interactive website and sporadic employee visits to Texas are irrelevant and not pertinent to a specific jurisdiction analysis. Appellant contends those factors apply only to a general jurisdiction analysis, and Appellees are blurring the lines between general and specific jurisdiction. However, Appellant points out specific jurisdiction may be invoked by "additional conduct" performed by the defendant in addition to placing its goods in the stream of commerce of the state, including "'establishing channels for providing regular advice to customers in the forum State'" and "marketing the product through a distributor who has agreed to serve as a sales agent in the forum State." *See Michiana*, 168 S.W.3d at 784-85; *Spir Star AG*,

310 S.W.3d at 873. Here, the interactive website allowed potential end-users and distributors—including those in Texas—to inquire about Appellant's products. Additionally, while employee travel to the state in question typically invokes a general jurisdiction question, the travel at issue in this case was, at least in part if not in whole, for marketing purposes to increase sales of Federal products in Texas, which is a factor included in a specific jurisdiction analysis. *See Asahi Metal*, 480 U.S. at 122; *see also Spir Star AG,* 310 S.W.3d at 873; *Semperit,* 508 S.W.3d at 577. Thus, while we agree with Appellant that the case law on these factors usually involve general jurisdiction questions, we find the specific circumstances of this case implicate the same factors in specific jurisdiction.

We find that findings of fact #67 through #70 are factually and legally sufficient. Appellant has purposefully availed itself of the privilege of conducting business activities within Texas. Appellant has intentionally targeted Texas as a marketplace for Federal tires. Appellant has made numerous intentional efforts to serve the tire market in Texas. Appellant has placed their tires into the stream of commerce knowing that many of them will reach Texas, and has gone so far as to directly ship their products to their distributor's locations in Texas.

### "Substantial Connection" between Contacts and Operative Facts

Having determined Appellant purposefully availed itself of forum where Appellees brought suit, we next examine whether a "substantial connection" exists between Appellant's contacts with Texas and the "operative facts of the litigation." *See Moki Mac*, 221 S.W.3d at 585.

We find the recent holdings by the United States Supreme Court in *Ford Motor Co.* and the Texas Supreme Court in *Luciano* instructive in this case. *See Ford Motor Co.*, 141 S.Ct. at 1026; *Luciano*, 2021 WL 2603840, at \*8. *Ford Motor Co.* involved two car accidents where the

plaintiffs were killed or critically injured allegedly due to faulty Ford vehicles and brought suit in the state where the accidents occurred. *Ford Motor Co.*, 141 S.Ct. at 1022-23. Although Ford conceded it purposefully availed itself of the forum states, it contended specific jurisdiction was lacking because the cars involved were originally sold by Ford outside of the forum state, and were not designed or marketed there. *Id.* at 1022-23. Ford's position was that its conduct had to "[give] rise to" the claims in the lawsuit, which could only be achieved if the company designed, manufactured, or sold the particular vehicle involved in the accident within the state in which the lawsuit was brought. *Id.* at 1023, 1026. However, as mentioned previously, the Supreme Court rejected Ford's argument, clarifying that although the "arise out of" portion of the nexus inquiry involved a causation question, the "relate[d] to" portion "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 1026. Instead, the Supreme Court found the following contacts Ford has with the forum state "relate[d] to" the plaintiffs' claims such that specific jurisdiction applied:

- The suits were brought by residents of the forum states;

- The accidents made the bases of the suits occurred in the forum states;

- 'Ford had advertised, sold, and serviced those two car models in both [s]tates for many years.'

*Id.* at 1028. The Court further noted, "Ford had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those [s]tates, [so] there is a strong 'relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Helicopteros Nacionales*, 466 U.S. at 414).

In applying *Ford Motor Co.* to the facts of *Luciano*, the Texas Supreme Court noted:

- the plaintiffs' suit arises from injuries they sustained at their Texas home;

- one of their claims is the defendant sold a defective product, failed to warn of necessary risks, and misrepresented the quality of the product in its advertising and marketing;

- defendant sold the product in Texas, and 'served a market' in Texas for the same product that allegedly injured the plaintiffs.

*Luciano*, 2021 WL 2603840, at \*10. The Texas Supreme Court also expressly rejected the defendant's claim that because there was not proof of where the specific product purchased by the Plaintiff was shipped, the plaintiffs failed to adequately demonstrate how the facts of their case related to the defendant's contacts with Texas. *Id.* at \*11. Instead, it followed the Supreme Court's lead in *Ford Motor Co.*, which repudiated the need for a strict causal connection and found instead that the defendant's intent to serve the Texas market for the product which allegedly injured the plaintiffs sufficed to prove the defendant's contacts with the forum state related to the operative facts of the plaintiffs' lawsuit. *Id.*

Here, it is undisputed the subject tire failed in Texas. According to Appellant, the subject tire was shipped to Phoenix, Arizona to Tire Dealer's Warehouse. Appellant is aware that its Couragia M/T 35 X 12.50 R18 LT tire, the model of the subject tire, has repeatedly been sold in Texas, at the very minimum of 2009 through 2014. Appellant stands behind their tires by warranting them in Texas. Appellant acknowledges they routinely delivered these tires to Texas locations. Thus, we conclude that Appellant's sales to out-of-state distributors who targeted Texas with Texas-based tire distribution centers, is an operative fact of this litigation.

Further, despite Appellant's urges to the contrary, we cannot say that the fact the subject tire may have been delivered to Phoenix, Arizona necessarily deprives Texas of jurisdiction. Given our holding in *Semperit*, and the recent binding precedent in *Ford Motor Co.* and *Luciano*, we are

persuaded that Appellant's purposeful availment to the State of Texas relates to operative facts of the claims brought by Appellees in this case. Appellant sold several millions of dollars' worth of tires, at the wholesale level to ostensibly out-of-state distributors, but delivered those products directly to distribution centers scattered throughout Texas. Appellant was aware that Tire Dealer's Warehouse sold tires in Texas. A Federal tire of the same model regularly distributed in Texas was purchased in Texas and allegedly failed in Texas, regardless of whether the particular tire in question was initially sent by Appellant to Phoenix or elsewhere. Accordingly, we find there is sufficient evidence to support the trial court's finding of a substantial connection between Appellant's contacts with Texas and the operative facts of this case.

**Fair Play and Substantial Justice**

Appellant asserts the notion of fair play and substantial justice is offended by the trial court's finding of specific jurisdiction; however, they fail to articulate the law or cite to the record, or identify any basis supporting their contention. Even if we liberally construe Appellant's argument the notion of fair play and substantial justice is offended by the finding of specific jurisdiction, the defendant bears the burden of presenting "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Guardian,* 815 S.W.2d at 231.

Appellant failed in the trial court below and in this Court to provide any evidence that would render the exercise of Texas' jurisdiction unreasonable and offensive to the due process concerns of *International Shoe.* To present an issue for appeal, an appellant's brief must contain, among other things, clear and concise argument for its contentions with appropriate citations to authorities and the record. *See* TEX.R.APP.P. 38.1(i). Appellate courts must construe the Texas Rules of Appellate Procedure reasonably, yet liberally, so that the right to appeal is not lost by

imposing requirements not absolutely necessary to enforce the rules. *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex. 2004); *see* TEX.R.APP.P. 38.9. However, an issue on appeal that is not supported by argument or citation to legal authority presents nothing for the court to review. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex. 1994); *J.C. Gen. Contractors v. Chavez,* 421 S.W.3d 678, 681 (Tex.App.—El Paso 2014, pet. denied). When a party fails to brief a complaint adequately, it waives the issue on appeal. *J.C. Gen. Contractors,* 421 S.W.3d at 681.

We have no duty, or right, to perform an independent review of the record to ascertain whether error exists, because an abandonment of our role as a neutral arbiter forces us into the position of an advocate. *Valadez v. Avitia,* 238 S.W.3d 843, 844–45 (Tex.App.—El Paso 2007, no pet.); *see also Sisters of Charity of Incarnate Word, Houston, Tex. v. Gobert,* 992 S.W.2d 25, 31 (Tex.App.—Houston [1st Dist.] 1997, no pet.)(addressing inadequate briefing and observing that party asserting error on appeal bears the burden of showing that the record supports the contention raised and of specifying the place in the record where matters upon which it relies or of which it complains are shown).

Appellant did not present any evidence regarding whether there may be a less burdensome forum to them. Once *International Shoe's* jurisdictional requirements are met, the forum's interest in adjudicating the dispute for the benefit of its residents takes priority. *See Michiana*, 168 S.W.3d at 799. Clearly, Appellees' have an interest in obtaining juridical relief in their home state. There is no evidence in the record that a more efficient forum exists with jurisdiction over this case. There, however, was no evidence of the judicial system's interest in furthering social policies. The evidence is legally and factually sufficient to support finding of fact #71 through #74; however,

there is no evidence to support finding of fact #75.

Accordingly, based on all the foregoing, we find as follows:

(1) the evidence is legally and factually sufficient to demonstrate purposeful availment under a 'stream of commerce-plus' theory, and we overrule Appellant's fifth issue;

(2) the evidence is legally and factually sufficient to establish specific jurisdiction because Appellant's contacts with Texas show it purposefully availed itself of the forum, the claims brought by Appellees relate to Appellant's contacts with Texas, and traditional notions of fair play and substantial justice are not offended by the exercise of jurisdiction in this case, and we accordingly overrule Appellant's third issue; and

(3) the findings of fact challenged by Appellant regarding jurisdiction are legally and factually sufficient to support the trial court's jurisdiction, with the exception of finding #75, and we overrule Appellant's first and seventh issues.

**CONCLUSION**

We conclude that findings of fact may be made in a special appearance proceeding; further, if a finding is unchallenged, it is binding upon us unless there is no evidence to support that finding or the opposite is established as a matter of law. We further find Appellees do not allege general jurisdiction applies to this case, and the evidence does not support a general jurisdiction finding. We find the evidence is legally and factually sufficient to demonstrate purposeful availment under a "stream of commerce-plus" theory, the claims brought by Appellees relate to Appellant's contacts with Texas, and traditional notions of fair play and substantial justice are not offended by the exercise of jurisdiction in this case. Finally, the findings of fact challenged by Appellant regarding jurisdiction are legally and factually sufficient to support the trial court's jurisdiction, with the exception of finding #75.

Having overruled each of Appellant's issues, we affirm the trial court's judgment.

44

August 10, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., McClure, C.J. (Senior Judge), and Hughes, J.
McClure, C.J. (Senior Judge)(Sitting by Assignment)
Hughes, J. (Not Participating)